Pryor Cashman Sherman & Flynn, LLP
Richard M. Betheil, Esq. (RMB - 8246)
Joshua Zuckerberg, Esq. (JZ- 9466)
Attorneys for the Plaintiffs
410 Park Avenue
New York, New York 10022
(212) 421-4100

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOJELI, INC. and ALAN RICK FRIEDMAN,<br><br>Plaintiffs,<br><br>v.<br><br>STEVEN MADDEN, LTD., STEVEN MADDEN, JAMIESON KARSON, and AMELIA NEWTON-VARELA.<br><br>Defendants. | 06 CIV. 506 (AKH) (MHD)<br><br>**JURY TRIAL DEMANDED**<br><br>**AMENDED COMPLAINT** |

Plaintiffs, Jojeli Inc. and Alan Rick Friedman, by and through their attorneys, Pryor Cashman Sherman & Flynn as and for their First Amended Complaint allege as follows:

## JURISDICTION

1. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332 (a)(1) in that the matter in controversy exceeds $75,000.00 and there is diversity between the plaintiffs and the defendants.

## VENUE

2. Venue is proper in this District pursuant to 28 U.S.C. §1391 (a) (1) in that certain of the defendants reside in this District and all of the defendants reside in the State of New York.

## PARTIES

3. Plaintiff, Jojeli, Inc. ("Jojeli") is a New Jersey company which is wholly owned and operated by Alan Rick Friedman.

4. Plaintiff Alan Rick Friedman is a New Jersey resident ("Friedman"). (Friedman and Jojeli are referred to collectively herein as "Plaintiffs").

5. Defendant Steven Madden, Ltd. ("Madden Ltd." or "Company") is a Delaware company with its principal place of business in Long Island City, New York. Madden Ltd. is primarily engaged in the design, sale, sourcing, and marketing of footwear brands for men, women, and children. Madden Ltd. is a publicly traded company.

6. Defendant Steven Madden ("Madden"), a New York resident, is the former CEO of Madden Ltd. and now serves as a designer for the Company.

7. Defendant Jamieson Karson ("Karson"), a New York resident, is the current CEO of the Company.

8. Defendant Amelia Newton-Varela ("Newton"), a New York resident, is an Executive Vice-President of Wholesale for the Company.

9. Defendant Arvind Dharia ("Dharia"), a New York resident, is CFO of the Company. (Madden, Karson, Newton, and Dharia are referred to collectively herein as the "Individual Defendants").

## FACTS

10. Friedman and Jojelli, Inc. began providing services to Madden Ltd. in or around January 1998.

11. Friedman was retained by Madden Ltd. as an independent contractor and was charged with establishing a division of Madden Ltd., the LEI division, which was to sell footwear under the LEI label throughout the country. LEI is a brand of shoe, the license for which was purchased by Madden, Ltd.

12. Friedman worked directly under the President of the LEI division, Joseph Masella. Friedman's responsibilities included establishing accounts, or stores which intended to purchase the LEI shoes, servicing those accounts, and counseling the accounts on the various LEI models. In his first year with the Company, Friedman's responsibilities required him to travel throughout the country opening accounts for the LEI division, and he spent approximately $100,000 of his own funds in travel expenses.

13. Since Friedman began performing services for Madden Ltd., his compensation has been largely commission-based. Friedman's weekly payment was a draw against commissions.

14. Friedman was the lead salesmen for the LEI division, and during his tenure with Madden Ltd., he established sales accounts with many major retailers in the United States, including May Co., Federated, Saks, Inc., and Kohl's.

15. Once Friedman began performing services for the LEI division, LEI's sales far exceeded Madden Ltd.'s expectations for the division. In Friedman's first year with the LEI division (1998), the division sold approximately $9 million dollars in LEI footwear.

16. Each year that Friedman worked for Madden Ltd., his sales were better than the year before, and he was always the number one or two salesman for the Company.

17. In 1999, the LEI division made approximately $15 million in gross sales; in 2000 the LEI division's gross sales were approximately $35 million. In 2001, the LEI division's gross sales were approximately $40 million. The LEI division's business peaked in 2002, with approximately $65 million in sales.

18. Since Friedman was the lead salesman who handled a majority of the LEI division's major accounts, it was his efforts that generated the majority of LEI's profits during the relevant time period. Even in those years when Madden Ltd's overall sales of LEI product went down, Friedman's LEI sales to his accounts continued to increase.

19. Consequently, Friedman's commission-based compensation increased each year. In 2002, for example, Friedman earned $900,000. For the last three years with the Company, Friedman has earned over a million dollars each year in compensation.

20. In or around 2003, Madden Ltd. President, Defendant Steve Madden ("Madden") was forced to leave the Company to serve a 41 month prison sentence for his role in a stock manipulation scheme. In addition to serving prison time, Mr. Madden agreed to pay, upon information and belief, approximately $8 million in restitution and civil penalties. Madden's agreement with the Securities and Exchange Commission ("SEC") barred him from serving as an officer or director of any company for seven years. Upon information and belief, Madden's agreement with the SEC bars him from

direct involvement in the financial and business affairs of the Company, and he is supposed to serve the Company solely as a designer.

21. Prior to Madden serving his time in prison, he appointed Karson, his long-time friend, to be CEO of Madden Ltd. In addition, another close confidante of Madden, John McCann, was placed in the position of President of the LEI division.

22. In the beginning of 2004, with Madden now serving his prison sentence in a Florida prison, Madden Ltd. entered into a licensing agreement with Candies, another line of footwear. Notwithstanding the established market popularity of the Candies line, Madden Ltd.'s other sales personnel were unable to secure lucrative accounts for the sale of the Candies shoes.

23. Soon thereafter, Karson asked Friedman to work on selling the Candies line. Within two months of having assumed responsibility for sale of the Candies line, Friedman secured a deal with May Co., one of the largest retailers in the United States, to begin selling the Candies line to May Co.

24. At around this time, in April 2004, Karson requested that Friedman enter into a new contract with the Company concerning his compensation. Friedman's contract at the time was set to expire in June 2004. In the new contract, dated April 26, 2004 (the "Contract"), Friedman was to continue to receive his compensation largely on a commission basis, with one hundred thousand dollars a year in guaranteed compensation. Although Friedman's commission rate remained at 4% of net sales, the Contract altered Friedman's compensation by adding the Candies line and eventually reducing his multiple accounts (or stores) to one account: Kohl's. Friedman was willing to accept a

reduction in the number of his accounts in part because the Company was extending the term of his Contract until December 2006.

25. The Contract was approved by the Company's Board of Directors and executed by CEO Karson and CFO Dharia.

26. In or around the first quarter of 2005, Kohl's department stores entered into an agreement with Candies whereby Kohl's would become the exclusive supplier of all Candies' products, except for footwear. Candies carved out an exception to the exclusivity arrangement with Kohl's because it already had an agreement with Madden Ltd., which allowed Madden to sell Candies shoes to various accounts. Candies entered into an agreement with Madden Ltd. which allowed Madden Ltd. to continue selling the Candies line of shoes until January 2007, and Kohl's guaranteed Madden Ltd. approximately $10 million in sales of Candies' footwear for the last half of 2005 and between $20 and $25 million in sales for 2006.

27. In or around early April 2005, Karson told Friedman that Friedman had to renegotiate the Agreement. Although the Contract was not set to expire until December 2006, and Friedman's sales continued to be excellent, Karson was pushing for this renegotiation because, upon information and belief, Madden had advised Karson that Friedman was earning too much compensation under its terms. Upon information and belief, Karson had been directed by Madden to renegotiate the Agreement. Karson indicated that Friedman would need to reduce his commission rate from 4% to 3%.

28. Notwithstanding the fact that Friedman's 4% commission rate had originally been negotiated with and approved by Madden, Friedman agreed to re-examine certain of the Agreement's terms if Karson was prepared to extend the term of the

Agreement. Karson told Friedman that if he accepted the reduced commission rates, Karson would "take care of him later," or words to that effect. Friedman declined to renegotiate his Contract based on Karson's vague verbal promise.

29.     When Madden returned to the Company in or around mid-April 2005, he immediately attempted to effectuate the managerial directives he had, upon information and belief, issued from prison. Notwithstanding his settlement agreement with the SEC, which excluded him from involvement in the business and financial affairs of the Company, Madden proceeded to have at least four different conversations with Friedman concerning his Agreement.

30.     At these different meetings, Madden stated to Friedman that Friedman had embarrassed the Company's CEO, namely Karson, by negotiating such a beneficial compensation package and that he should reduce the commission rate. Friedman stated to Madden that his commission rates had always been 4%. In addition, Friedman advised Madden that the Board of Directors had approved the Contract, so there could be no argument that Friedman had somehow duped the CEO.

31.     Madden was furious that Friedman had rejected his efforts to reduce his compensation and began a malicious and orchestrated campaign to create a hostile working environment for Friedman which would either a) cause Friedman to quit and terminate his Contract; or b) prevent Friedman from obtaining the commissions, bonus, and other payments to which he was entitled under the Contract (the "Campaign"). Madden's Campaign was initiated by Madden but the Madden Ltd. executives, including Karson and Newton, agreed to the plan and effectuated it.

32. In July 2005, Friedman was called into a meeting with Karson and told that he was a negative influence on Madden, Ltd., and was not getting along with other people in the Company. Friedman denied these allegations and requested, both at the meeting and then subsequently by letter, that Karson provide him with specifics concerning these allegations. Karson failed to provide such specifics.

33. At this same July 2005 meeting, Karson told Friedman that instead of reporting directly to the President of the LEI division, as he had done for the last seven years, he would now report directly to Karson. In addition, Karson told Friedman that - - notwithstanding his status as an independent contractor - - Friedman would be required to submit weekly itineraries. Friedman questioned this requirement but complied with the request. Karson also instructed Friedman to visit local Kohl's stores throughout the country. Although this is generally an assignment given to a very junior sales employee, Friedman submitted a written proposal to Karson on how to complete this burdensome and demeaning assignment, which included the suggestion that Friedman would visit certain stores, and that Friedman would hire a junior person to visit the other stores who Friedman would compensate out of his own funds. Friedman consulted with Meg Hopkins, the Senior VP of Shoes at Kohl's, who indicated that it would not be necessary for Friedman to send a person to all of its stores, and that if a visit was required for a certain store, Kohl's would indicate that to Friedman.

34. As part of Madden's Campaign, the Company executives, including Karson and Newton, began to intentionally exclude Friedman from important meetings concerning Kohl's, Friedman's major account. For example, in or around July of 2005 Friedman organized a meeting between Kohl's and Madden Ltd. executives. Friedman

451355v8                                    8

was then told by Karson that he was not to attend the meeting. Madden Ltd. executives, including Karson and Newton, intentionally scheduled other meetings, including those involving Friedman's accounts, on days when Friedman had scheduled "days off."

35. In October 2005, upon information and belief, Madden ordered Madden Ltd. executives, including Karson and Newton to move Friedman from his private office and place him in another office with two junior employees. The Madden Ltd. executives, including Karson and Newton, effectuated these instructions and moved Friedman.

36. On or around November 16, 2005, Madden and other Madden Ltd. executives, including Karson and Newton, made a sales call to Kohl's with the explicit purpose of selling Candies products. Madden intentionally excluded Friedman from this call despite the fact that Friedman had a 4% commission on sales of Candies and that Kohl's was Friedman's account.

37. Upon information and belief, Madden initiated this Campaign out of pure malice for Friedman and/or based on his own self-interest without any concern for the interest of Friedman or the Company. Madden's new compensation arrangement with the Company provided that he receive a percentage of all sales by his new division "SM of NY". Upon information and belief, Madden intended to push Friedman out of the Company, at least in part, so that SM of NY could replace the LEI line Friedman had been selling to Kohl's. Madden Ltd. executives, including Karson and Newton, agreed to and participated in the Campaign and allowed themselves to be directed by Madden even though his agreement with the SEC prevented from acting as an officer or director of the Company.

38. On or around November 24, 2005, Friedman sent an email to Madden's secretary – as all Company employees had been instructed to not correspond directly with Madden so that there was no appearance of his direct involvement with Company decisions – and asked that Madden keep him "in the loop" on the on-going communications with Kohl's.

39. On November 28, 2005, before the Company had advised Friedman that the Contract was being terminated, Newton stated to Meg Hopkins, Senior Vice President of Shoes at Kohl's, that Friedman had been "let go" by the Company, or words to that effect. Newton made this statement with ill will and/or maliciousness, and/or with culpable recklessness. Newton's statement has caused damage to Friedman's reputation in the industry.

40. On November 28, 2005, at the behest and direction of Madden, Karson improperly terminated Madden Ltd.'s Contract with Friedman and Jojeli, Inc. and stated that the termination was "for cause," but refused to identify the alleged cause. On December 1, 2005, Friedman received a letter in which the Company purported to explain the "for cause" basis of the termination of the Agreement. The letter stated that Mr. Friedman had been terminated due to his "failure to be engaged on a full-time basis on behalf of [the Company]; [Friedman's] material breach of the Agreement and of [the Company's] rules; and [Friedman's] failure to comply with proper directives . . ."

41. In the December 1, 2005 letter, Madden Ltd. failed to provide any specifics on the purported bases for the termination. However, Madden Ltd. stated that Friedman was bound by the Agreement's restrictive covenant provision, which prevents him from "provid[ing] consulting services to, or engage or participate in a business

which, [for a one year period] is competitive, directly or indirectly, with the Business." The "Business" is never defined in the Contract.

42. Pursuant to the terms of the Contract, the restrictive covenant expires with the Contract if the Contract is not terminated for "cause."

43. By letter dated December 6, 2005, Friedman's counsel objected to the Company's attempt to enforce the restrictive covenant and explained to Madden Ltd. that the Company's efforts to enforce the restrictive covenant were making it impossible for Friedman to find alternative employment. By letter dated December 9, 2005, counsel for Madden Ltd. reiterated the Company's position that Friedman was bound by the restrictive covenant.

44. Due to the Company's bad-faith enforcement of the restrictive covenant, Friedman has been severely hampered in his ability to find another position. Madden and Karson know, or should know, that January is a crucial time for retail companies to employ or retain new sales representatives because the national shoe show takes place in February. Absent Defendants' bad-faith enforcement of the restrictive covenant, Friedman would be able to secure a position earning compensation of approximately four to five hundred thousand dollars a year.

45. Madden and Karson know, or should know, that the restrictive covenant is only triggered if Friedman is terminated for cause. Madden and Karson also know, or should know, that even if Friedman had been terminated for cause, the Company has no legitimate interest in enforcing the restrictive covenant against Friedman. Friedman does not posses any trade secrets or confidential information. In addition, Madden Ltd's termination of Mr. Friedman makes it clear that the Company, Steve Madden, and Karson

do not consider him a unique employee or to have client relationships, the exploitation of which could harm Madden Ltd's financial interests.

46. Madden and Karson know that the Company did not have cause to terminate Friedman. Therefore, Madden, Karson and Madden Ltd. are enforcing the restrictive covenant for no other reason than to damage Friedman's reputation, prospective economic advantage, and ability to earn a livelihood. Madden and Karson know that the longer Friedman is unemployed, the more difficult it will be for a 57 year old to find subsequent employment.

47. Friedman's compensation through the term of the Contract, December 31, 2006, would amount to approximately $2.5 million. Of this $2.5 million, approximately $350,000 represents fourth quarter 2005 commissions, bonus, and other payments which are currently due and owing to Friedman, a portion of which has been paid. Approximately $400,000 of that amount is due to Friedman under a provision of the Contract which provides said payment if the license for one of Friedman's lines, LEI, goes back to the licensor, Jones Apparel ("Jones"), prior to the termination of the Contract. Upon information and belief, Defendants Madden, Karson, and Newton had agreed to return the LEI license to Jones prior to his termination in November of 2005, but refused to disclose this fact in an effort to deny him that portion of his contractually guaranteed compensation.

48. Friedman's entitlement to these fourth quarter commissions is not contingent upon a determination on whether Madden Ltd. had cause under the Contract for the termination. Madden Ltd. and Madden's refusal to pay Friedman the fourth

451355v8                                    12

quarter commissions is malicious, in bad faith, and without any basis in the Agreement, past practice, or industry custom.

### FIRST CLAIM (Breach Of Contract)

49. Plaintiffs repeat and reallege paragraphs 1 through 48, as if fully set forth herein.

50. Plaintiffs are parties to the Contract with Madden Ltd.

51. Madden Ltd. has breached the Contract though the conduct detailed herein including, but not limited to, terminating the Contract without cause and failing to pay commissions, bonus, and other payments currently due under the Contract.

52. Madden Ltd. created a hostile working environment for Friedman, as detailed herein. Madden Ltd's hostile working environment constituted a breach of the Contract through a constructive termination.

53. Madden Ltd's breach of the Contract has caused damages to Plaintiffs in an amount to be determined at trial, but in no event less than approximately $2.3 million dollars.

### SECOND CLAIM (Implied Covenant Of Good Faith And Fair Dealing)

54. Plaintiffs repeat and reallege paragraphs 1 through 53, as if fully set forth herein.

55. By entering into the Contract, Madden Ltd. owed an implied covenant of good faith and fair dealing to Plaintiffs.

56. Madden Ltd. breached the implied covenant of good faith and fair dealing by a) creating the hostile working environment as detailed herein, which was designed to

force Friedman to quit or prevent him from achieving his commissions, bonus, and other payments under the Contract, and b) terminating the Contract without cause.

57. Madden Ltd.'s breach of its implied covenant of good faith and fair dealing has caused damages to Plaintiffs in an amount to be determined at trial, but in no event less than $2.3 million.

### THIRD CLAIM ( Violation of the Labor Law)

58. Friedman repeats and realleges paragraphs 1 through 57, as if fully set forth herein.

59. Friedman is a "sales representative" as that term is defined in Section 191-a(d) of the New York Labor Law (the "Labor Law").

60. Under Section 191-c of the Labor Law, Friedman was entitled to payment on all earned commissions within five business days after termination or within five business days after they become due in the case of commissions not due when the Contract was terminated.

61. Madden Ltd. has breached Section 191-c of the Labor Law by failing to pay Friedman earned commissions in the time prescribed by the Labor Law.

62. Madden Ltd.'s breach of the Labor Law has damaged Plaintiffs in an amount to be determined at trial, but in no event less than approximately $500,000 in commissions, bonus, and other payments which are currently due and owing, double damages, and attorney's fees, court costs, and disbursements as provided by Labor Law § 191-c(3).

63. The Individual Defendants are all principals as that term is defined at

451355v8                                    14

Section 191-a(c) of the Labor Law, and are liable for all damages due Friedman under the Labor Law.

### FOURTH CLAIM (Violation of the Labor Law)

64. Plaintiffs repeat and reallege paragraphs 1 through 63, as if fully set forth herein.

65. As an alternative claim to Plaintiffs' Third Claim, Friedman is a "commission salesmen" as that term is defined at Section 190(6) of the Labor Law, or "other worker" as defined in Section 191(d) of the Labor Law.

66. Madden Ltd. has breached Section 191 of the Labor Law by failing to pay Friedman earned commissions, bonus, and other payments in the time prescribed by the Labor Law.

67. Madden Ltd.'s breach of the Labor Law has damaged Friedman in an amount to be determined at trial, but in no event less than approximately $500,000 in commissions, bonus, and other payments which are currently due and owing, liquidated damages equal to twenty-five percent of the amount of commissions, bonus, and other payments due, and attorney's fees, court costs, and disbursements as provided by Labor Law § 198 (1-a).

### FIFTH CLAIM (Tortious Interference with Contract)

68. Plaintiffs repeat and reallege paragraphs 1 through 67, as if fully set forth herein.

69. Madden Ltd. and Friedman were parties to the Contract. Defendants Madden, Karson, and Newton interfered with that contract through wrongful means by

maliciously creating a hostile working environment as detailed herein, and maliciously causing Madden Ltd. to terminate the Contract without cause.

70.  The conduct of Madden, Karson, and Newton, was outside the scope of authority of their respective positions with the Company.

71.  Madden, Karson, and Newton's tortious interference with the Contract has caused damages to Friedman in an amount to be determined at trial, but in no event less than $2.3 million dollars.

### SIXTH CLAIM (Civil Conspiracy)

72.  Plaintiffs repeat and reallege paragraphs 1 through 71, as if fully set forth herein.

73.  Madden, Karson, and Newton agreed and conspired to tortiously interfere with Friedman's Contract; participate and effectuate the hostile work environment detailed herein; interfere with and/or prevent Plaintiffs' efforts to obtain the commissions, bonus, and other payments to which he was entitled under the Contract; and to otherwise cause the Company to terminate, both constructively and in fact, the Contract.

74.  Madden, Karson, and Newton engaged in a civil conspiracy against Friedman which has caused damages to him in an amount to be determined at trial, but in no event less than $2.3 million.

### SEVENTH CLAIM (Prima Facie Tort)

75.  Plaintiffs repeat and reallege paragraphs 1 through 74, as if fully set forth herein.

76.  Madden Ltd., Karson, and Madden have, through their counsel, threatened

to enforce the restrictive covenant contained in the Contract.

77. Madden Ltd., Karson, and Madden, know or should know, that the restrictive covenant contained in the Contract is unenforceable in this situation. These Defendants' continued enforcement of the restrictive covenant is motivated solely by disinterested malevolence and/or malice.

78. Madden Ltd., Karson, and Madden's enforcement of the restrictive covenant has prevented Friedman from obtaining gainful employment and caused him to suffer special damages to be determined at trial, but in no event less than four to five hundred thousand dollars a year.

**WHEREFORE,** Friedman respectfully demands judgment in his favor as follows:

(a) A declaration that any restrictive covenant terms in the Contract are null and void as against Plaintiffs;

(b) On the first claim (Breach of Contract), against Madden Ltd., an award of compensatory damages in an amount to be determined at trial but in no event less than $2.3 million, plus interest at the statutory rate, and exemplary and punitive damages;

(c) On the second claim ( Breach of Implied Covenant of Good Faith and Fair Dealing), against Madden Ltd., an award of compensatory damages in an amount to be determined at trial but in no event less than $2.3 million, plus interest at the statutory rate, and exemplary and punitive damages;

(d) On the third claim (Violation of the Labor Law), against Madden Ltd. and the Individual Defendants, an award of compensatory damages in an amount to be determined at trial but in no event less than $500,000, plus interest at the statutory rate, and statutory double damages, and attorney's fees, court costs, and disbursements;

(e) On the fourth claim (Violation of the Labor Law), against Madden Ltd., an award of compensatory damages in an amount to be determined at trial but in no event less than $500,000, plus interest at the statutory rate, and exemplary and punitive damages of 25% of the amount owed, plus attorneys' fees;

(f) On the fifth claim (Tortious Interference with Contract), against Madden, Karson, and Newton, an award of compensatory damages in an amount to be determined at trial but in no event less that $2.3 million, plus interest at the statutory rate, and exemplary and punitive damages;

(g) On the sixth claim (Civil Conspiracy), against Madden, Karson, and Newton, an award of compensatory damages in an amount to be determined at trial but in no event less than $2.3 million, plus interest at the statutory rate, and exemplary and punitive damages;

(h) On the seventh claim (Prima Facie Tort), against Madden Ltd., Madden, and Karson, an award of compensatory damages in an amount to be determined at trial but in no event less than $5 million dollars, plus interest at the statutory rate, and exemplary and punitive damages;

(i) Interest, costs and disbursements, attorneys' fees, and such other and further relief as the Court may deem just and proper

Dated: April 11, 2006

PRYOR, CASHMAN, SHERMAN & FLYNN LLP

By: _____
Joshua Zuckerberg (JZ-9466)
Richard M. Betheil (RMB-8246)
Attorneys for Plaintiffs
410 Park Avenue, 10th Floor
New York, New York  10271
(212) 421-4100

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: April 11, 2006

PRYOR, CASHMAN, SHERMAN & FLYNN LLP

By: _____
Joshua Zuckerberg (JZ-9466)
Richard M. Betheil (RMB-8246)
Attorneys for Plaintiffs
410 Park Avenue, 10th Floor
New York, New York 10271
(212) 421-4100

Pryor Cashman Sherman & Flynn, LLP
Richard M. Betheil, Esq. (RMB - 8246)
Joshua Zuckerberg, Esq. (JZ- 9466)
Attorneys for the Plaintiffs
410 Park Avenue
New York, New York 10022
(212) 421-4100

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOJELI, INC. and ALAN RICK FRIEDMAN,<br><br>Plaintiffs,<br><br>v.<br><br>STEVEN MADDEN, LTD., STEVEN MADDEN, JAMIESON KARSON, and AMELIA NEWTON-VARELA.<br><br>Defendants. | 06 CIV. 506 (AKH) (MHD)<br><br>**CERTIFICATE OF SERVICE** |

    I hereby certify that on April 11, 2006, I served a copy of Plaintiffs' Cross-Motion for Expedited Discovery; the Amended Complaint, and Memorandum of Law in Opposition to Defendants' Rule 12(B)(6) Motion to Dismiss and In Support of Their Motion For Expedited Discovery on Counsel for all of the named Defendants by causing said papers to be delivered by overnight mail to:

    Donald Rosenthal
    SCAROLA ELLIS LLP
    Attorneys for All Defendants
    888 Seventh Ave., 45th Floor
    New York, New York 10106

Dated: April 11, 2006



By: _____
    Joshua Zuckerberg (JZ-9466)

356953